**SOUTH CHICAGO COAL & DOCK CO. et al. v. BASSETT, Deputy Com'r of U. S. Employees Compensation Commission.**

No. 6808.

Circuit Court of Appeals, Seventh Circuit.

May 11, 1939.

Rehearing Denied June 6, 1939.

William J. Campbell, U. S. Atty., and David H. Neuman, Asst. U. S. Atty., both of Chicago, Ill. (Z. Lewis Dalby, Chief Counsel, U. S. Employees' Compensation Commission, and Chas. T. Branham, Associate Counsel, U. S. Employees' Compensation Commission, both of Washington, D. C., of counsel), for appellant.

Robert J. Folonie, of Chicago, Ill., for appellees.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

This appeal is from an injunction issued by the District Court against the enforcement of a deputy commissioner's award under the Federal Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., to the widow and infant daughter of deceased, who was drowned, October 31, 1937, in the Calumet River, while working on a fueling boat, the Koal Kraft.

Section 3 of the Longshoremen's Act, 33 U.S.C.A. § 903, excepts from its operation a "member of a crew." The deputy commissioner, after a full hearing, found deceased was *not* a "member of a crew." On the trial de novo in the District Court, the court found deceased *was* a member of a crew. The evidence taken at both hearings was similar.

Was the deceased's status as seaman or longshoreman a "jurisdictional, fundamental fact"? If so, then the District Court must pass on the issue, upon evidence adduced before it. Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598. If it is not fundamental and jurisdictional, the deputy commissioner makes the finding which is *conclusive* if supported by evidence. Voehl v. Indemnity Ins. Co., 288 U.S. 162, 53 S.Ct. 380, 77 L.Ed. 676, 87 A.L.R. 245.

Section 3, 33 U.S.C.A. § 903, provides:

"(a) Compensation shall be payable under this chapter in respect of * * * death of an *employee,* but only if the * * death results from an injury occurring upon the *navigable* waters of the United States * * * . No compensation shall be payable in respect of * * * death of—

"(1) A master or member of a crew * * *.

"(2) * * *

"(b) No compensation shall be payable if the injury was occasioned solely * * by the willful intention of the employee to * * * kill himself * * * ."

Section 919 provides for the filing of the claim with the Commissioner who "shall have full power and authority to hear and determine all questions in respect of such claim." Section 920 provides that in "any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary—(a) That the claim *comes* within the provisions of this chapter * * * ."

*The Facts.* The vessel, the Koal Kraft, on which deceased was employed, was used solely for fueling other vessels. It operated about eight months a year in the territory of the Calumet River (concededly a navigable water). It supplied coal to other vessels on their order, each operation consuming only a couple of hours. It had no sleeping or eating quarters. Its certificate of inspection required that "Included in the entire *crew* hereinafter specified and designated there must be 1 licensed master and pilot, 1 licensed chief engineer, 3 seamen, 1 fireman." If deceased were counted as a member of the crew, the full complement of the ship was present. Otherwise not.

Deceased had been in the employ of appellee from October 5th to the 31st, only, a total of 269 hours, at an hourly wage of sixty cents. He was paid semi-monthly—in all $161.40. His chief task was in facilitating the flow of coal from his boat to the vessel being fueled—removing obstructions to the flow with a stick. He performed such additional tasks as throwing the ship's rope in releasing or making the boat fast. He performed no navigation duties. He occasionally did some cleaning of the boat. He did no work while the boat was en route from dock to the vessel to be fueled.

Pertinent excerpts from the record relative to deceased's duties are set forth in the margin.[1]

---

[1] The Captain, testifying before the Deputy Commissioner:

"Q. And among the deckhands you claim the deceased was one? A. Yes, Sir.

"Q. Those, with yourself, constituted the crew of this vessel? A. Yes, sir. * * *

"Q. Can you tell me what Schumann's duties were while he was working on this boat? A. Why, he was a deck hand and he did general deck work. He handled lines, got on the dock and took the stern line and made it fast and on leaving the dock he threw the stern line off the dock.

"Q. Did he assist the fireman at any time? A. Why, yes, they were all willing to take an interest in learning to fire so in case the fireman got sick he could have a man to replace him. * * *

"Q. Under what status was he paid? I mean by that, was he paid as a seaman or sailor or deck hand? A. He was paid as a deck hand, as a member of the crew of the boat Koal Kraft. * * *

"Q. He took orders solely from you, is that right, Captain? A. Yes, sir. * * *

"Q. You say he worked with the fireman on the day he was injured? A. Yes, Sir. That is, he handled the line. The fireman ran the winch that operates the line and he passed the line off the dock, or put it on the dock, whatever the occasion would be. * * *

"Q. In employing this kind of help they sign no papers, do they? A. No, sir. * * * No local boat signs any articles. * * *

"Q. You say his duties were those of a deck hand? A. Yes.

"Q. What are the duties of a deck hand on a boat of this sort? A. Well, just general labor, keeping it clean, handling the lines, painting or whatever you ask him to do. * * *

"Q. Do they have to have any experience when they come on there, any kind of experience as seamen or sailors * * * ? A. No, sir.

"Q. They come on like laborers? A. Yes. They pick up the work as they work along there.

"Q. * * * Now, as a matter of fact, Schumann was called in only by telephone to come whenever there was work? A. Yes, sir.

"Q. Otherwise he was staying home waiting for a call to come to work? A. Yes, sir.

Presented for determination is the line of demarcation between the duties of the deputy commissioner and those of the District Court. The generalization is accepted that the determination of "jurisdictional facts" is reserved to the courts while issues involving "circumstances, nature, extent and consequences of injuries" are for the commissioner. The court's review of the commissioner's action, through an injunction suit, is limited. As to these latter questions, the court is limited to an ascertainment of any supporting evidence, while questions involving "jurisdictional" controversies are determinable by the court in a trial de novo. This differentiation of jurisdiction is derived from our constitutional theory,—the Federal Congress may not impose a liability on an employer except by virtue of the existence and involvement of the two factors—(1) navigable waters, and (2) master and servant relationship. And the determination of the existence of these two jurisdictional prerequisites may not be left to the decision of an administrative tribunal, but must be lodged in a court. Crowell v. Benson, supra. Other issues may, however, be left to administrative determination, and such findings are conclusive if supported by evidence.[2]

"Q. He was a plain laborer? A. Yes, sir. In other words, he was called a deck hand.

"Q. Now, he did not participate in any of the navigation of the boat did he? A. No, sir.

"Q. Isn't it a fact that the man's main work consisted of coaling up the steamboat, when the boat came up it was his duty to coal up the steamboat? A. No, while discharging the coal his duty was to keep the coal running in these hoppers up on deck with a pole.

"Q. If there was no work he didn't have any claim on you, if there was no work he would not come and ask for work. Isn't that correct? A. Why, no.

"Q. He would only come when you called him? A. Why yes. Well, generally he knew when he went home at night whether to wait for a call or come out the next day.

"Q. There was no obligation on your part to give him work? A. No, sir."

The fireman of the Koal Kraft testified before the Commissioner:

"Q. Did you know John Schumann? A. Yes, sir.

"Q. What part of the crew was he? A. He was on the after deck, a deck hand on the after deck.

"Q. What were his duties? A. Well, his duties, his main duty was to poke down the coal from the hopper on to the belt when it stuck there. He also put the line on the winch, he stood there and gave me signals. When the boat was tied up he went up and pushed coal down.

"Q. * * * did he do any work other than that occasionally? A. Well, he went down below and helped scrub the deck down there. * * * Any painting that was necessary to be done on the boat was a part of his job. The deck hand maintained the outside of the boat and inside.

"Q. You say the deck hands have nothing to do with the steering or with the navigation of the boat? A. No, they don't.

"Q. And while the boat is in motion the deck hands really have nothing to do? A. Well, I would say the deck hand has nothing to do except when there is an emergency breakdown * * *.

"Q. You said before that the main duty of John Schumann was to refuel this steamboat when your coal barge would come to it? That was his main duty? A. Yes.

"Q. Now, while he was working there he never slept there in the boat? A. No.

"Q. He stayed at home and was called whenever there was work? A. Yes.

'Q. That applied to all of you? A. Yes.

2 *Commissioner's finding on issues other than jurisdictional are final if supported by evidence:* Del Vecchio v. Bowers, 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. 229; Voehl v. Indemnity Ins. Co., 288 U.S. 162, 53 S.Ct. 380, 77 L.Ed. 676, 87 A. L.R. 245; Salmon Bay Sand & Gravel Co. v. Marshall, 9 Cir., 93 F.2d 1; Wheeler Shipyard v. Lowe, D.C., 13 F. Supp. 863, affirmed 2 Cir., 82 F.2d 1022; Hoage v. Royal Indemnity Co., 67 App. D.C. 142, 90 F.2d 387, certiorari denied Royal Ind. Co. v. Cardillo, 302 U.S. 736, 58 S.Ct. 122, 82 L.Ed. 569; Speaks v. Hoage, 64 App.D.C. 324, 78 F.2d 208, certiorari denied 296 U.S. 574, 56 S.Ct. 121, 80 L.Ed. 405; Malone v. Hoage, 64 App.D.C. 38, 73 F.2d 855; Wood Towing Corp. v. Parker, 4 Cir., 76 F.2d 770; Emp. Liability Corp. v. Hoage, 67 App. D.C. 245, 91 F.2d 318; McNeely v. Sheppeard, 5 Cir., 89 F.2d 956; Taylor v. McManigal, 6 Cir., 89 F.2d 583; W. J. McCahan Sugar Co. v. Norton, 3 Cir., 43 F.2d 505, certiorari denied 282 U.S. 899, 51 S.Ct. 212, 75 L.Ed. 792; Keyway Stevedoring Co. v. Clark, D.C., 43 F.2d 983; Bethlehem Shipbuilding Corp. v.

▮ We conclude that the inquiry into the crew-membership status is not jurisdictional in character, and, therefore, is one for the commissioner to determine, and his determination if supported by the evidence may not be disturbed by the District Court.

The following reasons underlie our conclusion: .

(1) The Supreme Court has held that *two* factors are jurisdictional (navigable waters, and employer-employee relation) because without their presence the Federal Government would have no power to act. The naming of the *two* jurisdictional prerequisites impliedly excludes the existence of others.

(2) Although being a "member of a crew" *excepts* one from the purview of the *coverage* section (Section 3, above-quoted) the Supreme Court has held that another exception from coverage, namely, suicide, is *not* a jurisdictional issue. These two statutory exceptions, namely, a "member of a crew" and a death by suicide, are of identical structure in the statutory set-up of this section, and a legal construction

given to the latter (suicide) might with plausibility be given to the former. If one is not a jurisdictional question, should we not give a like effect or construction to the other?

▮ (3) The statute should be construed liberally to protect laborers.[3]

▮ (4) The number of jurisdictional issues should not be increased beyond legal reason because the purpose of the Act was to expedite the hearing of claims and granting of awards and to simplify as greatly as possible the procedure in such matters, so that the needy, the helpless, and the ignorant would receive financial aid promptly.[4] The Act gives to the commissioner broad powers to accomplish this purpose.

▮ There remains only the review of the deputy commissioner's finding that Schumann was not a member of a crew. The District Court found otherwise on a trial de novo on evidence similar to that heard by the commissioner.

The evidence in our opinion, supports the commissioner's finding.[5] The following facts are significant:

---

Monahan, 1 Cir., 62 F.2d 299; Texas Employers Ins. Ass'n v. Sheppeard, 5 Cir., 62 F.2d 122; Wilson & Co. v. Locke, 2 Cir., 50 F.2d 81; Mich. Transit Corp. v. Brown, D.C., 56 F.2d 200; Independent Pier Co. v. Norton, 3 Cir., 54 F.2d 734; Wheeling Corrug. Co. v. McManigal, 4 Cir., 41 F.2d 593; Todd Dry Docks v. Marshall, 9 Cir., 61 F.2d 671; Lumber Mut. Cas. Co. v. Locke, 2 Cir., 60 F.2d 35; Pacific Emp. Ins. Co. v. Pillsbury, 9 Cir., 61 F.2d 101; Green v. Crowell, 5 Cir., 69 F.2d 762; West Penn Sand Co. v. Norton, 3 Cir., 95 F. 2d 498; Di Giorgio Fruit Corp. v. Norton, 3 Cir., 93 F.2d 119, certiorari denied 302 U.S. 767, 58 S.Ct. 480, 82 L.Ed. 596; Fulton v. Hoage, 64 App.D.C. 232, 77 F.2d 110; Northwestern Stevedoring v. Marshall, 9 Cir., 41 F.2d 28.

3 *The Longshoremen's Act should be liberally construed:* Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; West Penn Sand & Gravel Co. v. Norton, 3 Cir., 95 F.2d 498; Candado Stevedoring Corp. v. Lowe, 2 Cir., 85 F.2d 119, certiorari denied 299 U.S. 588, 57 S.Ct. 115, 81 L.Ed. 433; Rothschild & Co. v. Marshall, 9 Cir., 44 F.2d 546; Id., D.C., 56 F.2d 415; De Wald v. B. & O. Co., 4 Cir., 71 F.2d 810, certiorari denied 293 U.S. 581, 55 S.Ct. 94, 79 L.Ed. 678; Pac. Emp. Ins. Co. v. Pillsbury, 9 Cir., 61 F.2d 101; Gen. Acc., Fire Corp.

v. Crowell, 5 Cir., 76 F.2d 341; Jarka Corp. v. Monahan, 1 Cir., 62 F.2d 588; Eastern S. S. Lines v. Monahan, D.C., 21 F.Supp. 535; Bay Ridge Operating Co. v. Lowe, D.C., 14 F.Supp. 280; Fidelity & C. Co. v. Burris, 61 App.D.C. 228; 59 F.2d 1042.

4 Crowell v. Benson, 285 U.S. 22, 52 S. Ct. 285, 291, 76 L.Ed. 598. "The object is to secure within the prescribed limits of the employer's liability an immediate investigation and a sound practical judgment, and the efficacy of the plan depends upon the finality of the determinations of fact with respect to the circumstances, nature, extent, and consequences of the employee's injuries and the amount of compensation that should be awarded. * * * To hold otherwise would be to defeat the obvious purpose of the legislation to furnish a prompt, continuous, expert, and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task."

5 *Cases discussing the nature of the duties of a member of a crew:*
De Wald v. B. & O. R. Co., 4 Cir., 71 F.2d 810, certiorari denied 293 U.S. 581, 55 S.Ct. 94, 79 L.Ed. 678.
Bargeman whose duties were to check and supervise loading and unloading of

a) Schumann had no duties pertaining to the navigation of the vessel, except the incidental task of throwing the ship's line. His *primary* duty was to free the coal if it stuck in the hopper while being discharged into the fueled vessel, while both boats were at rest. He had no duties while the boat was in motion.

. b) He was paid an hourly wage. He had no "Articles" (a naval term meaning employment contract) and none were necessary in this kind of work. He slept at home and boarded off ship. He was called very early in the morning each day as he was wanted. While he had worked only three weeks, and it might have been possible that he would have been retained for years to come, his employment was still more akin to temporary employment. The Captain testified that he was under no obligation to give him work each day—no contract of regular employment.

c) While we have given some weight to the fact that the Certificate of Inspection required the craft to have a crew of five in addition to the master, and that in this instance five would be present only if Schumann were included, we are convinced that the word "crew" as used in the certificate has a different significance

---

cargo and keeping records of loads, and who went home every night and who was sole worker on barges which were not navigated under their own power, held not member of crew so as to preclude recovery for his death; "crew" being a collective noun and signifying the ship's company.

He made lines fast at dock and along side vessel.

He lived ashore and reported each·day to see if needed.

Work averaged three days a week.

Barge operated only in harbor.

Not responsible for navigation, only incidental task of lines.

For certain purposes comes under category of seaman, but it doesn't follow he was a seaman in true sense—one who is engaged in voyages upon a ship or vessel and assists in the navigation of the vessel and is exposed to perils of sea, or, in other words, a seaman in the common acceptance of the term.

Significant Congress didn't use term "seaman."

The clause of the act excepting members of the crew, is one intended to restrict rather than extend and when we consider the purpose and history of the legislation as well as the nature of his duties and the use of the barges on which he·was from time to time employed by the day, he was not a member of the crew.

Warner v. Goltra, 293 U.S. 155, 158, 55 S.Ct. 46, 47, 79 L.Ed. 254.

"One can find a like range of variation in the use of the word 'crew.'" "It is sometimes used to comprehend * * * the officers and common seaman, excluding the master; and sometimes to comprehend the common seamen only, excluding the master and officers."

Taylor v. McManigal, 6 Cir., 89 F.2d 583.

The deceased was killed while working as a mechanic. He had not assumed the duties of an assistant engineer. The most that can be said is that he with the other men working on the boat expected to become members of the crew when it was ready to sail. The commonly accepted meaning of the word "crew" is the whole company which mans a ship and aids in the navigation, or the ship's company.

Presumption is that in the absence of substantial evidence to the contrary the claim comes within the provision of the statute. The court held the preponderance was to the same effect. The court held deceased was fixing a boiler while ship was in dry dock and was not a member of the crew.

Seneca Washed Gravel Corp. v. McManigal, 2 Cir., 65 F.2d 779.

Night watchman on vessel in winter quarters held not member of crew. No part in navigation. Lived on shore. Never on boat when under way. Was watchman year around. Not shown in certificate of inspection that there was a night watchman in crew. Employment not for navigation purposes.

"The word 'crew' is used in the statute to connote a company of seamen belonging to the vessel, usually including the officers. It is the 'ship's company.' The crew is usually referred to and is naturally and primarily thought of as those who are on board and aiding in the navigation without reference to the nature of the arrangement under which they board."

Required no knowledge of shipping or navigation and could have been performed by anyone who had not been so instructed.

Union Oil Co. v. Pillsbury, 9 Cir., 63 F. 2d 925.

Third officer who was paid off and reengaged as night watchman while vessel was in dry dock held not member of crew because he was temporarily employed for the few days the ship was in dry dock (he occupied quarters on ship).

and connotation than the word "crew" as used in the statutory exception. The Longshoremen's Act contemplated the exclusion of that body of men who in the common parlance make up the ship's complement,—those who regularly or ordinarily are engaged in seafaring and navigation, not those whose tasks are of such a nature that they are independent of navigation in their scope, such as tasks which might as well have their background on shore, or at the dock (such as watchmen, etc.[6]). The task of prodding coal down a runway might just as well have as its background a coal truck, a round house, or a mine, as a steamship. It was an ordinary laborer's job, and it was merely happenstance that the location of this position was on shipboard.

Even though the construction of this statute necessitated a different answer to the jurisdictional question, the result would be the same.

A District Court in reviewing the finding of the deputy commissioner, made in a proper case, is precluded from weighing the evidence. He may only inquire into the existence of any evidence to support a finding that the deceased was not a seaman. In such a case the District Court was required to examine the record and ascertain whether there was any evidence to support the commissioner's finding.

Likewise, on this review, assuming a trial de novo was proper and the seaman status presented a jurisdictional question, we must examine the evidence to ascertain whether there was any evidence to support the court's finding that he was a seaman.

In either case the facts are not in dispute. Therefore on undisputed evidence, is the finding, which we might call a conclusion that the deceased was a seaman, consistent with the undisputed facts?

Convinced as we are that the evidence establishes a non-seaman status, it follows that the court erred in holding to the contrary.

The decree is reversed with directions to vacate the injunction and dismiss the bill.

---

[6] *Watchmen are within the Act:* Seneca Washed Gravel Corp. v. McManigal, 2 Cir., 65 F.2d 779; Union Oil Co. v. Pillsbury, 9 Cir., 63 F.2d 925.

*Cases wherein term "crew" under Longshoremen's Act is discussed:* De Wald v. B. & O. R. Co., 4 Cir., 71 F.2d 810, certiorari denied 293 U.S. 581, 55 S.Ct. 94, 79 L.Ed. 678; Taylor v. McManigal, 6 Cir., 89 F.2d 583; Seneca Washed

Gravel Co. v. McManigal, 2 Cir., 65 F.2d 779; Diomede v. Lowe, 2 Cir., 87 F.2d 296; Lawson v. Md. Cas. Co., 5 Cir., 94 F.2d 193; Perry v. U. S. Emp. Comp. Comm., D.C., 27 F.2d 144; Union Oil Co. v. Pillsbury, 9 Cir., 63 F.2d 925; Harper v. Parker, D.C., 9 F.Supp. 744. See also Warner v. Coltra, 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254.